CHARLES COPPINS, RESPONDENT, *v.* THE NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, APPELLANT.

*Action by an employee against a railroad company, for continuing in its employment*
*an incompetent and negligent switchman — what facts are sufficient to charge the*
*defendant with knowledge of his negligence — the defendant is not released by*
*the contributory negligence of another employee — when a verdict will be set aside*
*as excessive.*

This action was brought by the plaintiff to recover damages for injuries sustained by him while employed by the defendant as a brakeman, which were alleged to have been caused by the negligence of the defendant in continuing to employ one Schram as a switchman at the station where the accident occurred. Upon the trial evidence was given tending to show that Schram, whose intelligence, sobriety and physical ability were fully established, had been employed in the yard for six or seven years; that at the time of the accident the defendant's rules required that the switches which connected two tracks upon which passed the trains going east and west should be closed and locked, and that no train should be permitted to cross them within twenty minutes immediately preceding the arrival of a passenger train.

On the day of the accident, about half an hour before an express train was due, Schram opened the switch to enable a work-train to cross from the track upon which the express train was approaching to the other track, neglected to close it, and about ten minutes prior to the arrival of the express train, left the yard and went to his house, about 1,600 feet away, to eat his supper, leaving the switch open. When the express train was about 400 feet east of the switch, running at the rate of about thirty-five miles an hour, its engineer saw from the red face of the target at the switch, which was turned towards him, that it was open, he reversed his engine and blew for brakes, but was unable to stop the train, which entered the switch and passed upon the cross-over, whereby the locomotive and several cars were derailed and the plaintiff injured.

Upon the trial Schram testified that when he was on duty from noon until midnight it was his general, but not uniform, practice to leave the yard for twenty or thirty minutes, between five and six o'clock in the evening, for the purpose of going to his house and eating his supper, and, also, that when on duty from midnight to noon, he was accustomed to leave the yard for the same time for the purpose of eating his breakfast.

*Held,* that there was sufficient evidence to justify the court in submitting the question to the jury as to whether Schram had become, prior to the accident, negligent in the discharge of his duties.

The track-master, the immediate superior of Schram, and the ticket agent and telegraph operator at the station, and an engineer on the defendant's road, knew of Schram's practice of going to his breakfast and supper during his hours of duty.

*Held,* that the evidence was sufficient to justify the jury in finding that the defendant's executive officers, whose duty it was to employ and discharge switchmen, knew, or ought to have known, that Schram was accustomed to go to eat his breakfast and supper during his hours of duty.

Whether, at the time of the accident, the red side of the target could have been seen at a sufficient distance to have enabled the engineer to have stopped the train, with the brakes then in use, before reaching the switch, was a contested fact upon the trial.

*Held,* that, as it appeared that the open switch was one of the causes of the accident, the defendant could not escape liability because the concurrent negligence of the engineer might have contributed to the accident.

The plaintiff, who at the time of the trial was an unmarried man of forty-one years, entered the service of the defendant in 1866, became a brakeman on a passenger train in 1870, and was earning forty dollars a month at the time of the accident. The leg of the plaintiff below the knee was injured, but the leg was saved, the healing taking place within the period of five months, leaving it a little shorter than the other. The plaintiff being able to walk without a cane or crutch, had, prior to the trial, pursued the avocation of a bar-tender, which required him to be on his legs most of the time. He also received some injuries upon his head, chest and back, and his physicians bill amounted to $750.

*Held,* that a verdict of $13,500 was excessive, and that a new trial should be granted unless the plaintiff elected to reduce the damages to the sum of $7,000. with interest thereon from the date of the trial.

APPEAL from a judgment entered in Onondaga county, and from an order at the Circuit in that county, denying a motion for a new trial made upon the minutes of the justice before whom the action was tried. The verdict was for $13,500. One of the grounds named in the motion for a new trial was, that the damages found by the jury were excessive.

A former appeal was before this General Term in January, 1887, from a judgment on a verdict of $15,000. In considering that appeal it had no occasion to consider the question now made as to the extent of the damages. (*Coppins* v. *N. Y. C. & H. R. R. R. Co.*, 43 Hun, 26.)

*William G. Tracy*, for the appellant.

*Louis Marshall*, for the respondent.

FOLLETT, J. :

Appeal from a judgment entered on a verdict, and from an order denying a motion for a new trial, made on the minutes and heard on a case containing all of the evidence.

At St. Johnsville the defendant has a large yard in which there are several parallel and diverging tracks, besides its four main or traffic tracks. The main or traffic tracks are numbered from south to north, Nos. 1, 2, 3, 4. Nos. 1 and 2 are used for first class; and Nos. 3 and 4 for second class trains. Passenger trains going east use No. 1, and passenger trains going west use No. 2. Tracks called "cross-overs" connect the parallel tracks and enable trains to pass from one parallel track to another. The cross-overs when in actual use are connected with the parallel tracks by switches, but when a train is not passing from one track to another, prudent management and defendant's rules both require that these switches be closed and locked, thus severing the connection between the cross-overs and the parallel tracks. At the east end of this yard there was a cross-over, connecting, among others, tracks Nos. 1 and 2. The switch which connected this cross-over with track No. 2 opened with its point to the east, or, in other words, a train must be running west on track No. 2 to enable it to enter this switch and pass by this cross-over onto track No. 1. This was a target switch. The target was twelve or fifteen inches across, and three or four feet

from the ground. When the switch connected track No. 2 with the cross-over the red side of the target faced the east and was a signal to engineers running west on track No. 2 that the switch was open, and track No. 2 connected with the cross-over. This target was plainly visible to engineers approaching it from the east on track No. 2 for fifty to eighty rods.

May 10, 1880, train No. 7, known as the Special Chicago Express, running west on track No. 2, was due at St. Johnsville (where it did not stop) at five o'clock and three minutes in the afternoon. When this train was about 400 feet east of the switch, running at the rate of about thirty-five miles an hour, its engineer (Michael Rickard) saw the red side of the target turned towards him, upon which he reversed his engine and blew for brakes, but was unable to stop the train, which entered the switch, passed onto the cross-over and the locomotive and several cars were derailed just as or after the locomotive reached track No. 1. This plaintiff was at that time and for a long time had been employed as a brakeman on this train, and on this occasion was brakeing on the forward platform of the second drawing-room car. The "Creamer brake" was then in use on this train in addition to the hand brake.

By the accident plaintiff's right leg was severely and permanently injured; for which he seeks, by this action, to recover the damages sustained by him. Plaintiff bases his right to recover solely upon the proposition, that defendant was (as plaintiff asserts) negligent in continuing to employ Martin L. Schram, the switchman who had charge of the misplaced switch, which negligence was (as plaintiff asserts) a juridical cause of the plaintiff's injury. The plaintiff sought to establish this general proposition by asserting and proving the following minor ones: (1.) That for a long time prior to the accident Schram had been uniformly negligent in the discharge of his duties. (2.) That defendant negligently continued Schram in its employ. (3.) That Schram left the switch open. (4.) That leaving the switch open was a negligent act. (5.) That the open switch was the (or a) proximate cause of plaintiff's injury. Upon the trial much was said about Schram's incompetence and negligence, these words being used as synonyms. There is no evidence that Schram was mentally, or phsically incompetent to discharge the duties assigned to him. At the time of the accident he was fifty-one

years of age. He had been employed in this yard and in the same work for six or seven years. His intelligence, sobriety and physical ability were not only not questioned, but were affirmatively established on the trial. Confessedly, he possessed sufficient physical and mental ability and experience to enable him to properly discharge his duties. It can not be said that he was incompetent.

On the day of the accident, and for several years prior thereto, Martin L. Schram and Patrick Fenton had been employed in the yard as switchmen. They were permitted to divide their time so as to serve six hours on and six hours off, or twelve hours on and twelve hours off; and they chose the latter mode of serving. At this time Schram served from noon until midnight; and Fenton from midnight until noon. At the time of the accident the defendant's rules required and the practice was, that a train should not cross a passenger track within twenty minutes immediately preceding the arrival of a passenger train; but during that time, and until the passenger train had passed, the switches connected with the track upon which the train was running were to be closed and locked. About half an hour before the Special Chicago Express was due, and arrived at this station on this occasion, Schram opened the switch to enable a work train to cross from track No. 2 to track No. 1, and neglected to close it, and about ten minutes prior to the arrival of the Special Chicago Express he left the yard and went to his house, about 1,600 feet away, to eat his supper, leaving the switch open. That Schram was negligent is admitted. But the defendant denies that Schram had been for a long time prior to the accident negligent in the discharge of his duties. The only act committed or omitted by Schram during his six or seven years service in this yard, which the plaintiff alleges to have been negligent, was his custom when on duty from noon until midnight, to generally, but not always, leave the yard for twenty or thirty minutes between five and six o'clock P. M., for the purpose of going to his house, 1,600 feet away, and eating his supper; and also when on duty from midnight until noon, to generally leave the yard for about the same length of time for the purpose of eating his breakfast. Schram testified that such was his general but not uniform practice; and his evidence is not contradicted or qualified.

The division superintendent testified that it was Schram's duty

to see that this switch was disconnected from the cross-over and locked, so as to permit this train to pass through the yard on track number two in safety, and that it was his duty to signal this and all passenger trains not stopping at this station. The safety signals were white flags in the day time and white lights in the night time; and the danger signals were red flags in the day time and red lights in the night time.

Schram and others testified that when switchmen were otherwise engaged in the yard they frequently omitted to exhibit the customary signals to passing trains. Whether this was known to defendant's executive officers does not appear; but that it was known to the engineer of this train, and to the employes in the yard, does appear. Schram testified that he did not understand that his duty required him to exhibit signals when otherwise engaged. The division superintendent also testified that there was no written or printed rule forbidding switchmen to leave the yard during their hours of duty to eat their meals, but that it was forbidden by oral instructions.

After the Special Chicago Express passed, no passenger trains passed this station for an hour, in which hour Schram had been for a long time accustomed to go to his house, sixteen hundred feet away from this switch, and eat his supper, which usually took him from twenty to thirty minutes. While he was absent there was no switchman in the yard. He testified (which was undisputed), that he had never before been absent when the Special Chicago Express arrived on time, but that on a few occasions, when it was late, he had gone to his supper expecting to return before its arrival, but had failed to reach the switch until after it had passed. He also testified that on the day in question he left the yard ten minutes before the arriving time of this train, believing at the time that he had disconnected the switch from the cross-over and locked it, making track number two continuous and safe.

There was sufficient evidence to justify the court in submitting the question to the jury, as to whether Schram had become, prior to the accident, negligent in the discharge of his duties.

Mr. Edwards, the track master, was the immediate superior of Schram, and General Priest, the division superintendent, was the

immediate superior of the track master, and had general supervision and control of defendant's employees upon his division. Schram's practice of going to his breakfast and supper during his hours of duty had been known to Edwards for some years, and for about two years to Miss Nelson, the ticket agent and telegraph operator at St. Johnsville; also to Mr. Poot an engineer.

General Priest had been several times in the yard when Schram was at breakfast or supper, but it does not appear that his attention was called to the fact that Schram was absent during his hours of duty. However, the evidence is sufficient to justify the jury in finding that defendant's executive officers, whose duty it was to employ and discharge switchmen, knew, or ought to have known, that Schram was accustomed to go to his breakfast and supper during his hours of duty.

Under the evidence, the first and second propositions were questions of fact for the jury. (Whar. Neg., §§ 237, 243.)

The truth of the third and fourth propositions is conceded by the defendant; but it denies the fifth, that the open switch was the (or a) proximate cause of plaintiff's injury, and asserts that the omission of the engineer of the Special Chicago Express to earlier observe the target of the switch, the red side of which was turned towards, and warned him that the swith was open, was negligence, and the proximate cause of the accident. Whether, at the time of the accident, the red side of the target could have been seen at a sufficient distance to have enabled the engineer to have stopped the train with the brakes then in use, before reaching the switch, was a contested fact before the jury.

"When several proximate causes contribute to an accident, and each is an efficient cause, without the operation of which the accident would not have happened, it may be attributed to all or any of the causes; but it cannot be attributed to a cause unless, without its operation, the accident would not have happened." (*Ring* v. *The City of Cohoes*, 77 N. Y., 83; *Ehrgott* v. *The Mayor of New York*, 96 id., 264, 283; *Taylor* v. *City of Yonkers*, 105 id., 202, 208.) It is apparent that the open switch was one of the causes of the accident, without which the accident would not have happened; and under the rule laid down in the cases last cited, the defendant cannot escape liability because the concurrent negligence of the engineer

may have contributed to the accident. It follows, the court correctly refused to charge the twenty-sixth request.

The defendant requested the court to charge : " That Schram having inspected the switch in question ten or fifteen minutes prior to the accident, did all that he was accustomed to do while he remained in the yard, and the accident was not caused by his absence from the yard." The court refused to charge this as a rule of law, but left it as a question of fact for the jury. The court could not declare what Schram might have discovered had he remained in the yard ; and the court did not err in refusing to charge as requested.

The defendant's liability does not rest upon whether Schram might, or might not have discovered the open switch if he had remained in the yard ; which question seems to be quite one side of the issue ; but its liability turns upon whether defendant's officers· were negligent in continuing to employ Schram as a switchman ;. which was, under the evidence, we think, a question of fact for the. jury. Whether Schram's habit of leaving this switch unattended and going to his supper, was negligence, was left to the jury, and we cannot say that the evidence is insufficient to sustain the finding· that it was. This being found, the evidence justifies the finding that the defendant's officers knew of this negligent custom, did not correct it, but continued to employ the switchman. It was a question for the jury to determine whether this negligence of the defendant was a cause of the accident.

The appellant calls attention to the following exceptions taken to· rulings admitting and excluding evidence : The plaintiff was permitted to show that between the date of the accident and January, 1885, the buildings in this yard had been somewhat changed. The· appellant fails to show why this was irrelevant, or how it was harmed by its reception. The ruling at folio 328 was not erroneous ; it was conceded by both sides that at this time there were but two switchmen employed in the yard ; that only Schram was on duty at that hour, and it follows that when he was absent there was none there. It was relevant to show (fol. 381) that Schram knew that it was his duty to be in the yard when this train passed, for it bore upon the question of his negligence. The evidence at folio 745 was competent in explanation of the evidence drawn from the same witness by the defendant at pages 225, 226, 241, 242. It was not incompe-

tent to permit the plaintiff to show by the cross-examination of Rickard, defendant's engineer, that the sun shining on the track prevented him from seeing the target at a greater distance. There is nothing in the record showing that any improper use was made of the rejected map, and we are unable to see in what respect the appellant was injured by the use made of it.

We find no errors of the court committed on the trial calling for a reversal of the judgment; but having determined that the damages awarded are excessive, the judgment must be modified in accordance with the opinion of the presiding justice.

HARDIN, P. J., and MARTIN, J., concurred.

HARDIN, P. J.:

While I concur in the opinion of brother FOLLETT that the exceptions taken upon the trial present no error calling for a reversal of the judgment, I am not satisfied that the learned judge at Circuit, in refusing a new trial, properly disposed of the question made in respect to the extent of the damages. The injuries received by the plaintiff were to his leg below the knee. The leg was saved; the healing thereof took place within the period of five months; the limb is a trifle shorter than the other. The plaintiff is able to walk without a cane or crutch, and prior to the trial pursued the avocation of bar-tender, which required him to be on his legs most of the time. He was an unmarried man, forty-one years of age at the time of the trial. He entered the service of the defendant in 1866; in 1870 he became a brakeman on a passenger train and was earning forty dollars a month at the time of the accident; he received some injuries upon his head, chest and back; his physician's bill amounted to $750. While we recognize the general rule that the damages awarded will not be disturbed as excessive where there is no certain measure of damages, unless there is reason to believe that the jury has been misled by passion, prejudice, or coerced by some piece of improper influence, we recognize the power of the court in its discretion to interfere with the verdict of the jury in such cases. (*Minick* v. *City of Troy*, 19 Hun, 253; *Gale* v. *N. Y. C. & H. R. R. R. Co.*, 13 id., 1.)

The learned counsel for the respondent calls our attention to several recent cases upon the question of excessive damages.

In *Gale* v. *New York Central and Hudson River Railroad Company, supra,* the verdict for $14,000 was allowed to stand, but in that case it appeared that the plaintiff's leg was broken near the hip, and it was an inch and a half shorter than the other. The injury was permanent, and the judge said in delivering the opinion, " A great injury was inflicted on the plaintiff; a permanent deformity produced, and a partial inability to work during the rest of his life."

In *Rockwell* v. *Third Avenue Railroad Company,* 64 Barb., 438, the verdict for $12,000 was allowed to stand. The plaintiff's earnings were $1,000 a year, and he was permanently lame. His physician's bill was from twelve to fifteen hundred dollars.

In *Walker* v. *Erie Railway Company* (63 Barb., 260) a verdict of $20,000 was allowed to stand, but it appeared that the injuries of the plaintiff "were of an exceedingly painful, serious and permanent nature, some of the important effects of which it is probable will continue during his natural life, and may sensibly abridge the period to which that might otherwise have been extended. He was of the age of twenty-eight years, in his early manhood, engaged in an extended and lucrative practice of the law, impaired by his inability to give it the attention which it required, and attended with bodily derangements that may measurably unfit him for the duties of its pursuit." He was a lawyer and a member of a firm with an extended and lucrative practice, yielding $37,000 a year, and his share was one-half.

In *Minick* v. *City of Troy* (19 Hun, 253), a verdict for $4,500 was allowed to stand for personal injuries received by a married woman. The extent of the injuries is not clearly made apparent by the report of the case.

In *Harrold* v. *New York Elevated Railroad Company* (24 Hun, 184), a verdict of $30,000 was allowed to stand, but the facts were very peculiar and are recited by Judge GILBERT as follows: " A man forty years old, in the full vigor of health, was suddenly injured by the shock of a collision which occurred upon the defendant's railroad. Besides many lesser injuries, the accident produced a concussion of the spine, the result of which has been chronic inflammation of the membranes which envelope the spinal cord. That disease is a progressive one. It has already largely impaired the plaintiff's faculties, both mental and physical, and will probably progress until

paralysis and premature death ensue." We are unable to say that a verdict of $30,000 in such a case is excessive. That amount surely is not more than liberal compensation for the injuries inflicted upon the plaintiff.

In *Groves* v. *City of Rochester* (39 Hun, 11), a verdict for $19,000 was allowed to stand in favor of a woman, twenty-eight years of age, who had been, up to the time of the injuries, remarkably healthy and active; " her injuries were severe, and her suffering has been very great. She still suffers from the effect of them, and medical opinion is that she may never fully recover, and that they may materially shorten her life."

In *Alberti* v. *New York, Lake Erie and Western Railroad Company* (43 Hun, 422), a verdict for $25,000 was allowed to stand. Plaintiff was thirty years of age, and, before the injury, in good health, and had been well educated. He was married and both himself and wife depended for their support upon his labor. He was so injured by the collision that he could do nothing. It appeared that his legs were drawn up and would remain so until he died; and that while he might live for some years, suffering in body and mind, he would never improve physically.

In *Murray* v. *Hudson River Railroad Company* (47 Barb., 200), is found the opinion of HOGEBOOM, J., in reviewing many cases bearing upon the question now under consideration. His deduction from the case and his application to the rule of the case then before him seemed to be reasonable. The case there considered is not wholly unlike the one before us. The jury in that case had found a verdict of $8,000. The judges united in an order granting a new trial unless the plaintiff should elect to reduce the damages to $6,000. That case was followed by the Kansas Supreme Court, December 21, 1886. (Kansas L. Jour., 302.)

Upon the facts developed in the case in hand, it seems reasonable that the verdict should be reduced to $7,000 or a new trial ordered.

If these views prevail, the proper formula is as follows:

Judgment and order reversed, and a new trial granted, upon payment of costs, unless the plaintiff elects to reduce the damages to the sum of $7,000, with interest thereon from the date of trial, and gives a stipulation to that effect within twenty days from the service of a copy of the order.

Judgment and order reversed, on the ground that the damages are excessive, and a new trial granted, on payment of costs, unless the plaintiff shall stipulate to reduce the verdict for damages to $7,000, in which event the verdict and judgment, as so modified, are affirmed, without costs to either party.